The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Morning, Mr. Bossen. Morning, Your Honor. Morning. You may proceed. Okay. Thank you, Your Honor. May it please the Court. My name is Tim Bossen. I represent the appellant, Hester Prynne. Ms. Prynne seeks, by this court action, to be removed from the Virginia Sex Offender Registry because her inclusion for life violates both the ex post facto and due process clauses of the U.S. Constitution. Addressing the ex post facto count first, I want to focus on the uniquely troubling provisions of the Virginia Registry. These are restrictions or issues not presented in the seminal case of the Supreme Court, Smith v. Doe, nor by any court faced by this, nor by any case in front of this court previously. The first such provision is the assignment of a supervisory officer to Ms. Prynne. This is found in the Virginia Code 9.1907C, which states the Virginia State Police should physically verify a registrant's information at least semi-annually during their whole term on the registry. Virginia effectuates the statute as we pledge in our complaint by specifically assigning an officer to Ms. Prynne to whom she must report all her required registration matters. Who is also permitted to, and does, randomly check on Ms. Prynne at any time at home or at work. And additionally, every two years, and this is found in Code Section 9.1903I, every two years Ms. Prynne is required to sign a consent form for this officer to access her electronic communications to determine the veracity of her electronic identity information. When considering the question of parole or probation, the Smith Court found compelling that there, the petitioners were free to move and to live and to work as other citizens with no supervision. Similarly, the Tenth Circuit found in the Shelby Patton case addressing the Oklahoma Registry, that in that case, finding that in-person reporting was not akin to probation, the court stated, there, there was no specific officer assigned to consult with the registrant or to supervise him. The absence of supervision distinguishes the reporting requirements from the historical understanding of probation. A supervising officer is not required by the federal SORNA law, and so this court did not take this issue up in the U.S. v. Under Seal case or the recent Wass case. Now, if you apply Smith's finding then, that as to supervision and the assigning of a supervising officer, it makes Virginia's registry, it makes very clear that Virginia's registry is akin to probation or parole, and that this level of supervision creates an affirmative disability and restraint on Ms. Prynne's conduct, which makes these two factors weigh heavily in favor of Ms. Prynne. The second issue presented here, not presented in other cases, is the branding of Ms. Prynne with a level of dangerousness. In 2001, seven years after Ms. Prynne had pleaded guilty, the state retroactively decided, sua sponte, that Ms. Prynne was a sexually violent offender. They then notated on her registry page, open to the public, with the statement of violent, yes, a statement that would appear in the present tense that Ms. Prynne is violent. That was changed by statute, I want to notify the court of this fact since this case has been pending, in July of this year, and so instead of stating violent now, it does state tier three, yes. That's really just a matter of semantics and doesn't change the fact because tier three is the highest level of dangerousness. And the Virginia State Crime Commission website actually says that tier three is the most serious level of sex offender. And I can assure you that Ms. Prynne, a 54-year-old grandmother, a model citizen, is not the most serious level of sex offender. As the Sixth Circuit found in the Snyder case where they struck down the Michigan registry, a registry that was very similar to the Virginia registry we're looking at here, the court found there that the tier classifications, quote, ascribe and publish the state's estimation of present dangerousness, and therefore it equates to shaming and branding of the offender. And unlike the Smith case where the Supreme Court— Counselor, as I understand those punishments from colonial times, those were very public. As you walked about in public, you could see by actual branding that those had happened to an individual. Here it appears to be different because if someone wants to find out those things, they have to go and look for them. It's not evident if you simply see someone out in public. Why isn't that a material difference? Yes, Your Honor. I would note when you're looking at the factors, the question is, is it like these other things? So it doesn't have to be exactly the same as shaming or branding historically, but I understand the court's position. And I would say there's two differences here. Well, it's not a position. I just ask a question. I'm sorry. I apologize. But there are two issues that are presented here that were not presented in the Smith case and in more historical cases. The first issue is that Virginia has an active registry. It actually by law requires schools, nursing homes, and assisted living facilities in Virginia to sign up to receive notifications of any identification changes by anybody locally on the registry. Meaning if Ms. Prynne so much as changes her car registration, every school in her area gets notice actively. It comes to their computer of her change. And I would also note that the Internet is so ubiquitous now. Virtually everyone's on the Internet. And other courts have looked at this as well. It's not just the registry itself. It's that other third-party sites pick up the registry and broadcast it out. Location-wise or whatever, and it sends it out to people. So, Your Honor, I believe that's how this has become far more of a public issue than it was even 20 years ago, especially in Virginia, the way the system is set up. Now, I was noting that unlike Smith, in the Smith case, the court found there that the Alaska registry only disseminated accurate information about a criminal record that is public anyway. But here, Virginia is actually publishing false information. It's decided wrongly that Ms. Prynne is violent. She's never been violent. She did not plead to a crime that was a violent crime. And she's not violent today. And regardless, the information does not just restate her crime that was committed back in 1993, allegedly, but it creates a new hurtful and false label that would otherwise not be in the public domain but for the registry that was set up by Virginia. And I would note, assigning and then publishing a current level of dangerousness is a new issue for this court. It was not raised in Under Seal or WASS or any other court or any other case from this court. Let me just ask a question. The Tier 3 designation, the change from violent to Tier 3, isn't Tier 3 premised on the nature of the underlying conviction? So it's a little bit different than the argument you were making about using the label violent, which could be construed to be a present assessment of danger. It is slightly different. I would note that the Snyder case, the Michigan case, was addressing this issue exactly. There in Michigan, they said Tier 3. They did not say sexually violent, as Virginia used to. So that is an issue. But still, if you go to Mrs. Prynne's page today on the registry, it says Tier 3, yes. Tier 3 is defined. If you Google Tier 3, of course, now all that shows up is sexually violent offender. And even the Virginia State Police's pamphlet or guidelines, excuse me, that we attached as Exhibit A to our complaint has been amended to say Tier 3, formally sexually violent offenders. So there's really no daylight between Tier 3 and sexually violent offenders on the Internet, which is where it really matters. But I would just say specifically to the court's question, it says Tier 3, yes. And then Tier 3 is defined, if you look it up, as the most serious level of dangerousness. So again, and just like the Snyder court found in the Sixth Circuit, you're basically labeling, you've decided to label Mrs. Prynne retroactively from her crime date as the most serious level of offender in Virginia. And it appears on the website to be active. It doesn't say she was formally convicted of a Tier 3 crime. You know, that would be clarifying. That would be public information already. But instead it says Tier 3, yes, to imply that she's currently at that level of dangerousness. Now, the third issue, and I think this is a very important issue to address, is this issue of rational connection between the Virginia Registry and the stated non-punitive purpose. Here, because we were only on the pleadings, the court looked at the stated purpose of the statute. And then our evidence in the record, three empirical studies attached to our complaint, Exhibits B through D in the record, and said there's a rational connection. Even though our empirical studies show that what's actually happening with these registry statutes like Virginia is the opposite effect, that it's increasing recidivism, if anything. On the record itself here, if we go no further, this would be an incredibly damaging result because the trial court basically said it doesn't matter what the evidence is. It doesn't matter how irrational or unreasonable the statute is. If it's actually producing the absolute opposite effect, it still passes this rational connection test. And that's just not proper. Now, finally, the final issue is the excessiveness of the registry as it relates to Ms. Prynne. As the record reflects, Ms. Prynne is a model citizen. She's not violent, never has been. She's virtually not a threat to re-offend. And yet, she's subject to virtually all the restrictions found in the Virginia Registry. And her failure to comply with even one of those is a felony under the law. And so, unlike in Smith, where the court noted that the Alaska Registry, we'll strike that. I've already gone into the fact that in Smith, the Alaska Registry was passive and was not passed out to anyone to ask for notification. And in here, Ms. Prynne is also on the registry for life. And as we talked about in our brief, the only way she gets off the registry is if she's dead or incapacitated. So, the registry as it relates to Ms. Prynne is clearly excessive on the record. We also have a second count, a substantive due process. I'll rely on my briefs primarily for that. I just would notice that the fundamental rights of travel and interstate travel and the fundamental rights of parent have been – there's a long history of the courts finding those to be fundamental rights, and they should be protected. And this statute is not nearly tailored to serve the compelling state purpose in this case. Unless the court has any questions for me, I will rest my time. All right. Thank you, Mr. Fawcett. Ms. Callan. Good morning, Your Honors, and may it please the court. Michelle Callan for Appelli, Colonel Settle. At the heart of this case – at its heart, this case is an ex post facto challenge to Virginia's sex offender registry. But the U.S. Supreme Court has rejected such claims to the sex offender registry, and this court has repeatedly rejected such ex post facto claims, including to Virginia's sex offender registry. And because Virginia's registry is similar to those of other states, a decision in Appellant's favor might not just invalidate Virginia's registry, but may well be invalidating North Carolina's, South Carolina's, West Virginia's, and Maryland's registries as well. Now, on that ex post facto piece, this court has held on multiple occasions that sex offender registries like Virginia's do not violate the ex post facto clause. Not only did this court hold in Ballard with regard to Virginia's sex offender specifically, but as recently as this past spring, this court reiterated its holding in Under Seal that the Federal Sex Offender Registration and Notification Act, SORNA, is non-punitive and thus does not violate the ex post facto clause. And that's the Wass case discussed in our 28J letter. Appellant has not, and cannot, show that the federal SORNA is so materially different than Virginia's sex offender registry so as to justify finding Virginia's unconstitutional while affirming this court's multiple holdings that SORNA is constitutional. Now, I'd like to address the two-step analysis in Smith. Under Step 1, that step is not disputed here. Appellant waived that point in her brief. And that makes sense because the act itself, in the act itself, Virginia's legislature was clear that the act's purpose is civil in nature, to protect the public. And the act is located in the civil part of Virginia's code, just like this court analyzed with regard to SORNA in Under Seal. The purpose of Virginia's sex offender registry, just like SORNA, is to ensure that people are aware of sex offenders when they decide where to let their kids play, where to shop, and where to let their kids trick or treat. So that brings us to Step 2 of the Smith analysis. Appellant has not shown, much less by the clearest proof Counsel, may I ask you a question? If a person lived in the far reaches of Virginia or any other state of Virginia, for example, and there was no one within, really, 100 miles of them, would it still apply to them? Yes, Your Honor. The registry applies to people based off the conviction. It applies based off the conviction, not based off the person. That's the point you said, is to make sure people know, you know, when they go to the grocery store or go to school, they stay away from people who are on the registry. But even if they're away from people on the registry, isn't that sort of an aptly styled, in this case, a Hawthorne type scholarly letter? Is the purpose? No, Your Honor. I mean, so I take your question to apply to the first step of the Smith analysis, the purpose step. And Virginia's legislature was very clear, and that's in Code Section 9.1900, as to the purpose of the sex offender registry. And that's consistent with this court's analysis in under seal, both looking at the stated purpose, but then also at where it appears in the code. There is an area in Virginia's code that's criminal, and that's not where this provision is. It is within the civil part of Virginia's code. And so the step one is the conclusion under step one is that Virginia's legislature did not intend for this to be penal. So then that takes us to step two, where the plaintiff must show by the clearest proof that even though that it overcomes the legislature's intent to create what is a civil scheme into a criminal scheme. Isn't that what the plaintiffs here are saying, that you have a person in their mid-50s, as you can also say, a grandmother, and this happened a long time ago. You're forever, you're closing the door on any idea of redemption, of a person living their lives totally different or whatever that may be. Isn't that a sense that it works to that, particularly since you upped this, this offense wasn't classified at this level at first. In Virginia, so this is a unique situation, and you got some other tiers in it, isn't it? A little different. You up there, call it a violent felony, and it recently changed, but the third tier is very easy. As counsel said, look on the other side of the ledge and say, oh, this is the highest level of sexual violence. So there it's important that the scheme looks at the crime of which the person was convicted and not the person herself. And the crime of which the appellant here was convicted was taking indecent liberties with a minor under her charge. In this case, a minor, a boy who was 15 years old. And I think it's important to note that Virginia's classification of this crime as a tier three crime is by no means an outlier. Just to name a couple of examples, New Hampshire, Nevada, Kansas, Florida, Oklahoma, all designate this offense as a tier three offense. And so I think it's important to note that the analysis that the Supreme Court grappled with in Smith and that this court has adopted is not specific to the individual. The ex post facto analysis does not entitle an individual to an individualized assessment. And I'll also note that there's no procedural due process claim here. So when we're looking at the ex post facto analysis, it's about the crime and the retroactivity of the crime and the elements in Smith. This is about the crime and the Virginia law taking indecent liberties with a minor. Does that require any violent act? I think it depends what your honor means by violence. I mean by the elements of the statute and how it can be prosecuted. Does it require any violence? No, your honor. It doesn't require any violence, does it? No, your honor. And Virginia now labels that a tier three classification just as numerous other states do. And so the focus there is the fact that the minor was under the person's charge. So here it was a nanny in her mid 20s having having intercourse with a 15 year old child under her charge. And so that and she pled guilty to that. And so the focus there is the age of the victim, which here is 15 years old. And then also the fact that the minor was under her charge. And so Virginia is by no means an outlier categorizing this crime as the highest level of offense. But you told me it was about the offense. And then your retort immediately was what happened in this case. But when we look at classifying crimes, we look at based on the elements, sort of a categorical, if you will, look at it. So the category would include it's basically like it talks about lascivious acts in the presence of concerning a child. Right. You could flash someone and they'd be guilty in Virginia. Can you flash in front of a minor and be guilty of that offense? No, because that offense involves a minor under the person's charge. And so I think a person, a person you're babysitting, you flash in front of them while they're watching the cartoon. Wouldn't that be wouldn't that be a part of the thing? I'm not sure, Your Honor. Well, you should know in terms of what you told me, we should focus on the offense. And you tell me you don't know the offense in terms of Virginia that you classify this person as violent. I mean, that's even more so how random and arbitrary. You don't know the elements of the offense in which you call violent? So I think it bears noting, Your Honor, that the that the that the offense, as my friend on the other side, recognized the offense is not labeled violent, nonviolent. It's a it's a classification based off tiers along the lines of precisely what what the federal SORNA does. Is there a tier higher than in terms of level of dangerousness or violence, higher than three? No, Your Honor. Right. OK, go ahead. But I think it makes sense then to take a step back and recognize where we are then with regard to the ex post facto analysis. So even if this court, if this court, even if this court concludes that the classification of tier three is is broader than it needs to be. The question under Smith's step two is whether the plaintiff has shown by the clearest proof that even though Virginia's legislature intended for the registry to be civil, its effects are so severe that they overcome the legislature's civil intent. Many of the arguments that appellant raises as to the specific Mendoza Martinez considerations have already been rejected on multiple occasions. And we lay them out in our brief. I'd like to. Sorry, let me interrupt with a question. You're talking about the plaintiff's burden to show with the clearest proof. This case was decided on a motion for summary judgment. So there there was no discovery as to the. The statute on misprint or anyone else, doesn't that distinguish this case from some of the other cases that were cited, which were decided at later stages of the proceedings? Your Honor, this case was a motion to dismiss, and there are there are cases. There are a number of cases also that address the issue at a motion to dismiss. In fact, this case is this this court's decision in Doe v. B.S.P. Was it a motion to dismiss? I'd also direct the court's attention to an Eighth Circuit case. It's called the Weems case. Little Rock. Little Rock Police Department. That's forty four fifty three. F third ten ten from 2006. That's an Eighth Circuit case that decided an ex post facto that affirmed the motion to dismiss dismissal of an ex post facto claim at the motion to dismiss stage. And I think it makes sense also that a number of the cases to which that were raised in this case, for example, the Smith case were not resolved in a motion to dismiss because a number of those cases predate the Twombly Iqbal test. And so the question is really whether or not there is there is more there's any discovery that would make a difference here and whether surviving a motion to dismiss makes sense in light of that. And my friend on the other side has not pointed to any discovery that's necessary. We this case raises legal issues and we accept all the allegations and the plaintiff's complaint is true. But notwithstanding them, they don't state a claim as a matter of law under the Smith ex post facto test. I would like to address the point that my friend on the other side raises with regard to probation and parole. Again, here, Virginia's sex offender registry is not an outlier. Life without parole and registration are qualitatively different. And as the Supreme Court explained in Smith, unlike parolees, sex offenders are free to move wherever they wish. And they need not seek permission to change their appearance to borrow a car or to seek psychiatric treatment. Numerous other states have supervised release type structures like Virginia's, Maryland, North Carolina, South Carolina, Louisiana. All of them have a similar monitoring of sex offenders in their registries and invalidating Virginia's on the basis of some sort of similarity to probation or parole would call into question all of these aspects of those sex offender registries. I think it's also important to note that even if this court views some resemblance to a criminal scheme, some resemblance is not enough to transform a civil statute into a criminal one in violation of the ex post facto clause. Even if there is some similarity, Smith still instructs us that this factor does not, may not weigh in favor of rejecting the legitimate legislature's intent to create a civil scheme. So taking a step back, even if accepting appellant's arguments here with regard to probation and parole, that's not enough to create the clearest proof that the registry is punitive in effect. And I think it bears noting with regard to the ex post facto piece that really the burden is very high on the plaintiff to overcome the significant deference that this court accords the legislature's stated purpose of creating a civil statute. Ms. Callum asked you a question. When we assess whether it is punitive, through whose lens do we look at it? Do we look at the impact on the person's life? Wouldn't that have to be the metric? I mean, because the state, all right, we label it over here, label it there. It's civil, so it's not punitive. That can't be the end of the inquiry. You agree with that, right, what they label it as, right? You agree with that? Certainly, Your Honor. Now, if labeling it alone is not enough, then don't you have to look at something that kind of goes back a little bit, Judge Galloway's question, at least in my mind, it triggered my mind. I don't know what Judge Galloway's intent was, but it triggered me in my mind. The question is, don't we have to look at maybe perhaps some evidence as to how this is punitive in terms of their lives, in terms of it's preventing them from being around children, their grandchildren, or carrying on their occupation? All of these things that you say, these things are terrible. I mean, you go on that thing and you can get little red pens in your neighborhood. It will tell you exactly where every person lives that's on the registry. And you can go ride by their homes. And they're subject to derisive looks. Oh, yeah, that's the one I saw. I don't even know the person. Never having a chance to even assess the quantity of their character. But just to say for the rest of their lives, yeah, that's her. That's where they live. So we have to look at those things in terms of for the rest. And Virginia at first did not make this an offense that was for life. At one point, you could apply and it would not be. Later on, they changed it to make it forever. No matter what you do, you can find a cure for cancer. Whatever you might do, find a vaccine that we're all hoping and praying for right now. It wouldn't make any difference. You're still on the registry. I think part of that is, yes, Your Honor. And I think it bears noting that the appellant here pled guilty before there was any registry whatsoever. So certainly I think that's inherent in the nature of the ex post facto analysis. And that's part of what the Supreme Court grappled with in Smith and what this court has grappled with in under seal. And recently in loss as to the specific kind of question about the applied nature of whether we look at the individual. We're not aware of any court that has ever thought of the ex post facto analysis as an as applied test. And I think that makes sense because the ultimate question is whether the legislature imposed punishment under the ex post facto analysis. Not an as applied inquiry as to whether this is punitive or not as to a particular individual. And that's why the registry focuses on the crime to which the person was convicted and not as to that particular individual. I'd like to just briefly address the due process aspect of this case, unless the court has additional questions on the ex post facto analysis. As to due process, I have three points, Your Honor. First, just disability. Second, applicable level of scrutiny. And third, the particular rights that appellant asserts. Appellant lacks standing to bring a number of the due process challenges and her challenges are not right. So, for example, her challenge regarding entry into schools. The act sets forth exceptions to restrictions regarding entry into schools. And appellant does not allege that she ever attempted to avail herself of those exceptions to enter school campuses. And I think some of that gets to your point, Chief Judge Gregory, about how the registry works on the ground. I think a lot of that then goes to the due process analysis. And then the question becomes, they are under due process. It is relevant as to just disability as to whether they apply to the particular plaintiff at issue in the case. So that's the first point on just disability with regard to due process. The second point is the level of scrutiny. Now, appellant insists that simply because she invokes fundamental rights, Virginia's sex offender registry must be subject to strict scrutiny. But it cannot be that at the moment the litigant invokes a fundamental right, strict scrutiny immediately applies. And the right to work is a great example of that. The right to work is subject to reasonable government regulation. There are numerous federal, state, and local regulations that broadly impact people's rights to work. But we do not apply strict scrutiny to those regulations. For example, licensing for certain jobs, taking the bar, all of those are examples where we do not strictly scrutinize regulations with regard to the right to work. As to the particular rights at issue that my friend on the other side raises, as to right to parent, nothing prevents the appellant from being a parent or for being involved in her stepdaughter's life. As to the right to her travel, it makes sense why we should have notification requirements for sex offenders to travel. If so, they cannot commit sex offenses out of state without being known that they are out of state. And as to privacy, courts have been clear that publication of truthful information is not a constitutional violation. Information that becomes public in Virginia is substantially similar to that in SORNA. You said make sure they don't commit a crime when they leave the state. That's the purpose of that? I think the purpose of the registry is to protect the public. And so it makes sense why there would be travel notifications. If a person left the state to go to the Cleveland Clinic to be cured from a very serious malady, they would have to register, wouldn't they? They would have to provide notification. That's correct, Your Honor. And then this dad that's trying to get well from the Cleveland Clinic or Mayo in Rochester, Minnesota, right? That's correct. Otherwise, is the purpose really fitting that? Is that really the purpose? But that's causing questions. What was the intent? Is it really punishment? It's not really to get at those things, is it? No, Your Honor. It makes sense why there would be a notification so that folks can know where offenders are. And that's why courts throughout the country. I see that my time has run out. May I finish answering the question, Your Honor? So that folks even in other states will know that they're there. That's correct, Your Honor. And so that they can't go unnoticed between various states and committing crimes in other states. So what does Virginia do? Virginia sends out a bulletin to the state. I'll be on alert. The person is now in our state. Otherwise, if that's your purpose, you must try to practically affect it, right? Real time, then you could go and say, I not only know where this person lives, I know what state they're in right now. Do you match that with an index for the public? So there are two pieces to the travel notification, Your Honor. One is that the offender herself both notifies, both provides notification. Right. Self-notice. And what's the other part? And then there's also a provision where officials in Virginia provide notification as well. So there are two pieces. Well, how does the public know that they're temporarily located in another state? Because we want to make sure they're protected now. Because you said so the people will know. How do they know that? Is it updated real time? And I can say, well, this person is out of state now. No, Your Honor, that piece of it is not public facing. That piece of it is facing is for officials to be able to know. Oh, for officials to know. Right. May I briefly conclude, Your Honor? Well, yes, you may. Yes. So certainly the registry is burdensome on offenders like appellants. But that does not make it unconstitutional. Under the ex post facto analysis and the due process analysis, this court, we ask that this court affirm. Thank you. Thank you so much, Mr. Bosley. You have reserves in town. Move. Sorry, I was trying to get it. OK. First, I just want to address this issue of intent versus effect because of the Supreme Court's decision in Smith. We did not feel like we could challenge with this court, but with the Supreme Court, we could this issue of intent. We do agree with the court. The intent to us seems very much to be punishment. But because the facts of Smith are so similar on the intent issue as to this statute, we've not attacked that at this stage. We are attacking the effect test, though. And I would point out, I noted counsel said that the four circuits addressed these issues and Ballard. Ballard is an unpublished opinion. But even worse than that, in the trial court, they didn't establish the facts. They didn't talk about the registry restrictions. And so it was an unpublished affirmation. It's really completely unhelpful to this case. Similarly, the under seal case, and I know Judge Agee was involved in that case, but it only dealt with the it was an early generation. Well, excuse me, not even early generation. It is the federal SORNA requirements, which are like an early generation state registry. And I'm looking at what it required. It was only the requirements to register to appear in person, although it didn't say how often. It definitely didn't say every three days. If you change any information, it did not say 30 minutes. If you change an Internet identifier, that was not presented in that case. And finally, the only other thing was that it was supposed to be published on the Internet. So that was it. Nothing else. No supervisory officer. No shaming. Nothing was presented in under seal. Nothing like what we're dealing with here with the Virginia registry. And I would just say that there are no cases that have come from the 4th Circuit that I am aware of that have been cited that actually deal with the facts as we've raised them in this case. The Doe case, I do want to speak to that briefly. Doe was dismissed on a standing technicality because the plaintiff there did not go through the process of filing in the state court. She didn't petition the state court to have a right to go to schools and churches. Again, the Doe court even said specifically that she was not challenging her placement on the registry, which is exactly what we are doing here. So there's no standing issue here. And Doe did not get to the substance. So it had no effect or it's not helpful at all in this case either. I wanted to note and I really wasn't going to go there, but counsel has gotten into the facts of this case. And I just want to clear the record and say this is one of the reasons we do want discovery because the reality in this case is that my client was basically attacked by a 15-year-old, almost 16-year-old football player who was the predator in the situation and came on to her. And the only thing she didn't do is fight him off. That was her crime in this case. She is not a predator. And the facts will bear that out if we get discovery in this case. So for counsel to raise that as a factual issue that's in their favor is just not the case. Speaking of that, and I know the court has asked this question, but we absolutely want discovery in this case. Multiple of these factors require evidence. And the other courts that have looked at these cases and other circuits and other jurisdictions have required evidence. For instance, first off, simple one, to prove that the registry is rationally related, we have a right to know what the state is based that upon. And in the Snyder case, for instance, the court looked at Michigan and said, have you even done a study to see if this is rationally related to your statute, to your purpose? And there they found Michigan very wanting. And I think I suspect that will be the case with Virginia as well. We'd also like to know what level of monitoring goes on with the state. They take electronic communications, they take Internet identifiers and make us consent to a search of our computers. We want to know what level of monitoring they're doing. I think that's going to speak greatly to the affirmative disability and restraint. And speaking of that issue, the Supreme Court said in Smith, when you look at an affirmative disability and restraint, the question is the effect on the person subject to the restraint. How can we get to those facts without discovery and the effect? And the court said in Smith finding there, of course, they found in favor of the government. But the court said the plaintiffs there had not proven any evidence of employment or housing discrimination. It was a very factual question. We have pled those facts in our complaint. We would like to get discovery to prove those facts in this case. And the effect on my client has been huge. You talk about harm to her reputation, to friendships, to the ability to interact with children. The list goes on and on. And finally, in the Shaw case in the Tenth Circuit brought this out. The question of excessiveness goes to the level of danger that the person is. So, of course, we have a right to do some discovery to prove that our client is not at risk of reoffending. And that should be presented to the court. I did want to mention one other thing. Counsel said that Virginia is not an outlier with its system of supervision. And I would just say in looking at all the cases, the many cases over the last few weeks on the registry issues, I have not found one case that's been presented to a court that has an assigned officer for sex registrants. The closest state that I'm aware of is Indiana. In Indiana, their law said the A officer can visit your house once a year. And the Indiana Supreme Court struck that statute down as being overly restrictive. So nothing like what we see in Virginia is present, but even less than that has been found to be unconstitutional. And then finally, I would just note counsel also said that ex post facto challenges are not supposed to be as applied. But that's just simply not the law. It's not what other courts have done. The 10th Circuit case in Shaw was an as-applied challenge, ex post facto. The 11th Circuit case that we cited in our brief, the Miami 8 case, also an ex post facto as-applied challenge. And I believe there are numerous other ones. Those are only the first two that come to my mind. And I think it's very appropriate for us to bring this as an as-applied challenge. Unless the court has any questions for me, I believe that is all I had. All right. Thank you, counsel. Thank you both for your arguments. We can't come down and shake your hand, but know that we appreciate so much of being here and helping us to wrestle with these difficult issues. And we thank you so much. And be safe and stay well. And with that, I'll ask the clerk to adjourn the court for today until tomorrow morning. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court. Thank you.
judges: Roger L. Gregory, G. Steven Agee, Stephanie A. Gallagher